Van Brunt, P. J.
On the 14th day of August, 1882, Jesse Hoyt died in the city of New York, leaving an instrument purporting to be his last will and testament, dated June 26,1882, which was executed in the manner and form prescribed by statute.
The testator left him surviving only one child, Mary Irene Hoyt, the contestant, and his widow, Helen Maria Hoyt, both of full age.
On the 18th day of August, 1882, said will was filed in the surrogate’s office of New York county for probate, and upon the petition of the executors, or some of them, a citation was issued to the said widow Helen Maria Hoyt, and the daughter Mary Irene Hoyt, to attend the probate of said last will and testament on the twenty-ninth of August, 1882.
Upon the said twenty-ninth day of August, 1882, an affidavit was filed with the surrogate, showing the personal service of the said citation on the widow Helen Maria Hoyt, at the city of New York, on the eighteenth day of August, 1882, and on the same day, in the said city, upon the daughter Mary Irene Hoyt, and no one appearing to oppose the probate of said will, such proceedings were afterward had that the said surrogate took the proofs of said will and thereupon adjudged said will to be a valid will of real and personal property, and the proof thereof to be sufficient, arid admitted the same to probate as a will of real and personal property and issued letters testamentary thereon.
Subsequently on the 10th of November, 1882, the said Mary Irene Hoyt presented her petition to the said surrogate alleging that she was twenty-one years old and upwards, and the daughter and only child of said Jesse Hoyt, deceased, the probate of the will of her father; the issuance of letters testamentary thereon to James W. Jackson, Alfred M. Hoyt and Samuel N. Hoyt; that she was removed to a lunatic asylum in Pennsylvania, on or about June 6, 1882, and that said removal was instigated by and was the act of the said Alfred M. Hoyt and Samuel N. Hoyt; that on the 15th or 16th day of August, 1882, she was permitted to return, ostensibly to attend the funeral of her father; that she was brought to New York by and in custody of the superintendent of said asylum and taken to the Windsor Hotel, and not to her father’s house; that upon her arrival the said Alfred M. Hoyt and Samuel N. Hoyt came there and in harsh and violent language informed her that she would not be allowed to attend the *734 funeral services, which, however, she did do on the 17th day of August, 1882, notwithstanding the attempts to prevent her, and returning therefrom the said Alfred M. Hoyt on his way back to the hotel, informed her that she must go back to the asylum, but that she need remain there only three weeks longer; that on the 18th day of August, 1882, Samuel N. Hoyt came to said hotel, and there in his pres ence the citation above-mentioned was served, and, also, a printed copy of the will was handed to her; that she read said citations and will and understood their import; that on the same day Samuel N. Hoyt caused her to be again removed to the said asylum and that she was there kept incarcerated until September 6, 1882, and that during ah this time she was not allowed to communicate with her friends, or with any one outside of the asylum, and that she was wholly denied and deprived of all possibility of asserting her rights or responding to said citation, or be present in person or by counsel at the hearing.
The petition further stated that the said Hoyts were large legatees under the will of Jesse Hoyt, deceased, and that said Jesse Hoyt, at the time of the making and acknowledgment of said pretended will, was greatly enfeebled by disease and suffering, and was not of sound mind and memory, nor competent to make a will and that said paper writing was not freely or voluntarily made or executed by said Jesse Hoyt as his last will and testament; that said will was obtained by fraud, circumvention and under influence practiced upon said decedent; that no opportunity was offered the petitioner to require that all the witnesses to the said alleged will and cognizant thereof should be produced and examined as they were entitled by law to be, or to request that any other witnesses should be examined as she was entitled by law to do, or in any manner to contest the proof of said alleged will.
The petitioner thereupon prayed for a decree opening the said default taken against her on the 29th day of August, 1882, and revoking, vacating and setting aside the letters tastamentary issued to the said .two Hoyts and James W. Jackson as executors as aforesaid, and that all of the devisees and legatees named in said alleged will should be cited to show cause why said default taken against the petitioner should not be opened without costs, and petitioner given an opportunity to contest the will and interpose her objections to said will, and why said letters and probate should not be revoked, vacated and set aside, and why she should not have such other relief as was just and proper.
The surrogate thereupon issued a citation to all the persons interested in said will and the probate thereof to *735 appear before him at his office on the 28th day of December, 1882, then and there to show cause why a decree should not be made opening the default taken against Mary Irene Hoyt on the 29th day of August, 1882, and revoking the letters testamentary issued to Alfred M. Hoyt, Samuel H. Hoyt and James W. Jackson and to show cause why the probate of said will should not be revoked, and why such further and other relief should not be granted
Upon the return of this citation the said legatees and executors appeared, and many of them filed answers to said petition.
The answer of the executors sets up that said Mary Irene Hoyt was confined in the asylum at the request of her parents; that they had nothing to do with her return to Hew York for the purpose of attending her father’s funeral; that they had nothing to do with her return to the asylum, but that the superintendent of the said asylum, as they are informed and believe, received his instructions solely from and acted under the authority of Helen Maria Hoyt, the mother of said Mary Irene Hoyt; that it was not true that said Mary Irene Hoyt, during her stay at said asylum, was not allowed to communicate with her friends; that between the time of the service of the said citation and the probate of the said will they received letters from the said Mary Irene Hoyt making various requests to them as executors of said will, and that they had no suspicion or cause to suspect until long after the will was admitted to probate that the said Mary Irene Hoyt had any intention or wish to oppose the probate of said will, and that they did not, nor did any of them, in any manner or form, directly or indirectly interfere with, prevent, restrain or hinder her from so doing. The answer further denied all the averments of said petition affecting themselves and relating to the want of testamentary capacity of the testator or the want of due execution of said will.
When the case came on for hearing, the executors proceeded to prove the will as if upon an original offer for probate, to which procedure no objection was offered by the contestant.
They called and examined the three subscribing witnesses to the will, who were cross-examined at great length by the counsel for the contestant, and then rested.
The contestant, through her counsel, then moved that the proponents be compelled to proceed with their case, on the ground that they had gone beyond the limits of formal proof in probate controversies in opening their case, and asked the court to confine the proponents to rebutting evidence after the contestant’s proofs should have been submitted.
*736 The proponents claimed that they had offered no proof other than that to show that the will was executed in due form and executed by a person free from restraint and having capacity to make a will.
The surrogate having taken the question under advisement, subsequently rendered a decision, in which he stated the questions at issue to be the following :
First. Was the will lately admitted to probate as the last will and testament of Jesse Hoyt duly executed with all the formalities prescribed by law ?
Second. At the time of its execution was the decedent of .sound mind and memory ? '
Third. Does it express his free, untramelled testamentary purposes ?
Amd after discussing the main question involved in the motion, decided that the proponents had not departed from the ordinary practice in any such fashion as to warrant him in imposing upon them the restrictions suggested by contestant’s counsel, and fixed a future day on which the contestant might proceed with her proofs.
The contestant took no exception to this ruling, and intermediate the decision and the day of trial served upon each of the executors and their attorney, and filed with the surrogate a notice that under the provisions of the statutes of the state of New York, and especially under section 2618 of the Code of Civil Procedure, the contestant would, before proceeding to introduce proof, require the examination of certain persons therein named, among whom were Dr. John M. Camochan, Dr. Henry B. Millard and Dr. George M. Dillow, physicians who attended the testator in his last illness.
Upon the next hearing before the surrogate the counsel for the contestant read the foregoing notice and the affidavit accompanying the same, showing the materiality of the witnesses named therein, and asked if the proponents had produced the persons named in the notice, to which the proponents answered that they had not.
Thereupon the counsel “for the contestant urged upon the court that under section 2618 of the Code of Civil Procedure, the proponents were bound to call the persons named in the notice served upon them, and make them their witnesses.
The counsel for the proponents insisted that the meaning of the section was simply that the proof should not be closed until any witnesses that the contestant might satisfy the surrogate were material should be examined, and that when so called they were the court’s witnesses.
The surrogate took the matter under consideration, and subsequently rendered a decision, in which he held that *737 witnesses at the instance of the contestant must be brought into court by the proponents whenever the proper notice has been filed and the surrogate has found them to be material, that they are not to be charged to the account of either party, that they are to be examined by the surrogate, that in cases where the proceeding before the surrogate has assumed as it had there assumed, the form of a trial in which the parties are represented by counsel, the surrogate could doubtless require such counsel to assist him in the examination; that the surrogate should see to it that both parties are afforded a fair opportunity for full and searching examination; that if the contestant so desired the testimony of the persons named in the notice would be taken at once, and that as those persons should be severally called to the stand, the court would give whatever special direction as to their examination the circumstances seemed to warrant. ‘
To this ruling of the surrogate the counsel for the contestant in no way excepted.
The counsel for proponents then stated that pursuant to the decision of the court they produced Dr. Camochan, one of the persons named in the notice.
The surrogate inquired if anyone desired to examine the witness, it being understood that neither party had the absolute right to examine the witness produced under the notice; that the examination being an examination of the court, the court would expect counsel to aid it in making its examination.
The counsel for contestant stated that they were unwilling to examine the witnesses in chief.
The counsel for the proponent stated that they having made out a 'prima facie, case, had no questions to ask Dr. Camochan or anyone else.
The surrogate thereupon directed the counsel for the proponents to make such inquiry as naturally» might be suggested by their knowledge of the fact that this witness was an attending physician upon the decedent at the latter part of his life.
The counsel for the proponents then stated that under the court’s direction he would make such inquiry as suggested itself to his mind as being appropriate.
Dr. Camochan was then called by the court, and, being duly sworn, was examined by the proponent’s counsel, and stated, without any objection being taken by contestant’s counsel, that he attended the testator as consulting physician and surgeon from the 3d of May, 1882, to the time of his death, and testified as to the diseases under which he was laboring, their effect upon him, etc.
*738 Thereupon the counsel for the contestant proceeded to examine the witness at great length.
The most of the other witnesses named in the notice were examed substantially in the same manner.
During Mrs. Hoyt’s examination Mr. Jackson was examined as a witness to raise a question as to Mrs. Hoyt’s competency as a witness, and before its completion one or two witnesses were examined on behalf of the .contestant, and upon its completion the contestants put in their evidence in chief upon the issues hereinbefore stated as having been determined by the surrogate to be the issues involved in the proceeding then pending and rested.
Thereupon the proponents proceeded with their witnesses upon the same issues and rested, and then the contestant proceeded to put in evidence in rebuttal, and thereupon, after some little additional evidence by the proponents, the evidence was closed and the case summed up by counsel and submitted to the surrogate for decision, who subsequently rendered a decision finding that the will of the testator was in all things sufficiently proved, and that the probate thereof must be confirmed, and a decree was thereupon .entered on the 5th day of October, 1884, by which it was adjudged and decreed that the probate of the last will and testament should be and the same thereby was in all things ratified and confirmed, and by which decree it was further adjudged and decreed that the allegations against the validity of said will, filed m the surrogate’s court on the 9th day of November, 1882, by Mary Irene Hoyt, should be and the same thereby were dismissed, and that the prayer of the said petition should be and the same thereby was denied, and from this decree this appeal is taken.
It has seemed to be necessary to thus set out in great detail the exact cause of the proceedings in the surrogate’s court, because of the first question which the learned counsel for the contestant claims to be raised upon this appeal, and to the discussion of which he devoted the most of the time allotted to him for oral argument, viz.: That the surrogate erred in refusing to open the default taken by proponents against contestant on the 29th day of August, 1882, and in refusing to set aside the probate of the will of Jesse Hoyt, and in refusing to vacate and revoke the letters testamentary issued thereon for the reasons that the procuring of the probate of the alleged will was a flagrant fraud upon the rights of the appellant; that the procuring of such probate-was a gross fraud upon the due and proper administration of the law and upon the court; that the procuring of such probate was a contempt of court; that the letters testamentary were unlawfully issued in fraud of the rights of the appellant and through fraud practiced upon the court.
*739 The difficulty with the present claim of the contestant is that no such issue was presented to the surrogate for trial upon the return of the citation issued upon the petition of the contestant
The course of the procedure upon the return of the citation shows that the application was treated by both proponents and contestant as a petition for revocation of probate under section 2,647 of the Code of Civil Procedure.
This procedure consisted of the taking of proof offered by the proponents, as if it had been an original application for the probate of the will of Jesse Hoyt.
No claim was made by the contestant that this was not the orderly course of procedure, or that there were questions which should be tried which would render this proof offered of no avail, that the whole proceeding should be vacated from the beginning because the previous probate had been procured by fraud. Upon the contrary, the whole tenor of the procedure shows that all that the contestant asked for she got, viz.: an opportunity to contest the validity of her father’s will.
If the previous proceedings left any doubt as to the contestant’s position that the sole issue to be tried was as to the validity of this will, it seems to have been entirely removed by the claim made by her counsel when the proponents claimed the right to rest their case after having put in their formal proof, that the proponents should be compelled to proceed with their case on the ground that they had gone beyond the limits of formal proof in probate controversies in opening their case, and that the court should confine the proponents to rebutting evidence after the contestant’s proofs should have been submitted.
The position of the contestant is here clearly defined. The controversy was designated as a probate controversy. The claim was that the proponents had gone beyond the limits of formal proof in probate controversies. They had offered no proof whatever except that relating to the due execution of the will, and that it was made by a person free from restraint and having capacity to make a will, and thus it is clear that it was the understanding of all parties that the only questions to be tried were those relating to the validity of the will.
This was evidently the understanding of the surrogate, which is plainly shown by the fact that in his decision upon this point he states clearly what the issues to be tried in that proceeding were.
He says “The questions at issue in this proceeding are the following:
“First. Was the instrument lately admitted to probate *740 as the last will and testament of Jesse Hoyt, duly executed in accordance with all the formalities prescribed by law?
“ Second. At the time of its execution was the decedent of sound mind and memory?
" Third. Does it express his free, untrammeled testamentary purposes?
‘ ‘ The decree whereby it has been heretofore admitted to probate must be revoked in accordance with the prayer of the petitioners, unless the questions shall all be answered in the affirmative. The situation of the proponents does not practically differ from that which they would occupy if the issues of the present contestation had been made up at the time the paper here in dispute was originally offered for probate. Code of Civ. Pro., § 2652; Collier v. Idley’s Executors, 1 Bradf., 94.
“And the decree by which it was granted must stand or fall according as proponents shall satisfy, or fail to satisfy, the surrogate, that within the meaning of section 2628 the alleged will was duly executed, and the testator at the time of making it was in all respects competent to make a will, and was not under restraint.”
The surrogate here states, with precision the issues as to which he understood proof was to be presented, which definition of their position the contestant accepted as true. We say accepted as true because she and her counsel must be deemed to have assented to this statement of the surrogate, as they in no manner expressed any dissent from it, and that any other question was involved was never hinted at so far as we have been able to discover, until the evidence in the case had been closed the cause summed up and submitted to the surrogate for decision and findings of fact and conclusions of law were presented to the surrogate for his action thereon.
Upon a trial before the court where certain issues are distinctly held by the court to be according to its understanding the only ones involved, and a party makes no objection, but allows the court and the opposing party to go on, take the evidence and try the case upon the' theory that those are the only issues involved, it is too late after all this is done, to claim that there is another issue which should have been tried first, which affected the validity of the whole proceeding.
By thus allowing the court to go on and try the merits of the controversy without any notice of a claim, that a preliminary issue should be disposed of first, the right to a' trial upon such prehminary issue is waived, and the case must be disposed of upon the issues which the court and opposing counsel have been led to believe are the only ones involved.
*741 The objection that the original probate was fraudulently 'procured was in the nature of a prehminary objection which if proved and insisted upon, ousted the surrogate of all jurisdiction, and prevented him from taking any further steps towards an establishment of the will until he obtained jurisdiction by new process.
It seems clear that when the contestant and her counsel allowed the surrogate to entertain the questions as to validity of the will without objection, they waived this prehminary question and could never thereafter raise it.
If any doubt can remain (which does not seem possible), that all the parties and the court understood, that the only question to be tried related to the validity of the will, and that the proceeding was to be treated as a propounding anew of the will for probate, it seems to be absolutely removed by reference to the proceedings of the contestant as to the examination of the witnesses named by her.
Her counsel claimed that under section 2618 of the Code of Civil Procedure, the proponents were bound to call the perspns named by the contestant.
This section relates to the proceedings upon a return of citation issued upon the presentation of a will for probate, and provides among other things than any person who contests the probate of a will may before the proofs are closed, require the examination of all the subscribing witnesses to a written will, or of any other witness whose testimony the surrogate is satisfied may be material.
This procedure can only be invoked upon a contest as to the probate of a will; it has no application to any other issue, and if the position of the contestant was that the surrogate had no power to proceed with any question relating to the probate of this will, because apparent jurisdiction has been conferred by fraud, what right had the contestant to invoke the process of the court, which could only be sought in a case where the probate of a will was at issue.
As has already been stated, it seems clear that the contestant had no intention of asking any decision upon any allegation in her petition relating to the alleged fraud in procuring the original probate. The whole proceeding was treated by all the parties as substantially a petition for revocation of probate, under section 2647 of the Code of Civil Procedure, and it was not until new counsel had come into the case, and the matter had been entirely tried upon the issues as to the validity of the will, that any intimation was given that any other issues were involved.
We think that this was too late. The parties must be held to the issues framed in .their presence and with their assent.
*742 This brings us to a consideration of the alleged errors in the admission and rejection of evidence.
The statement of the counsel for the contestant that the surrogate in admitting the testimony of Doctors Millard, Dillow and Camochan as to information acquired by them and each of them in attending the decedent as a patient in a professional capacity as physicians and which information was necessary to enable them to act in the capacity of physicians to the decedent, would naturally lead one to suppose that the evidence of these witnesses had been offered by the proponents and that the same had been objected to by the contestant.
But the fact being that these witnesses were examined upon the demand of the contestant, her counsel insisting that the will could not be admitted to probate unless they were examined, and upon their absolute right to have them examined, because they were material, being the attending physicians of Jesse Hoyt during his last illness, it is difficult to see how the contestant can claim any benefit from any error which the surrogate may have committed in the admission of the evidence of these witnesses, such error being committed in compliance with her demand.
It is true that after the evidence was all in and the contestant had found that nothing had been made by her demand that illegal evidence should be admitted, a motion was made on her behalf to strike it out, which was denied and an exception taken to such denial.
Although the surrogate may have based his ruling upon an erroneous ground, there was no error in the denial of the motion.
In fact, in view of the position taken by the contestant as to the examination of these witnesses claiming them to be material because they were the attending physicians of Mr. Hoyt, it would seem to have been almost an abuse of the discretion lodged in the trial court in such cases to have granted the motion of the contestant to strike out this evidence merely because she had been hoisted by her own petard.
The fact that this evidence was incompetent, because it was forbidden by statute, does not in any way affect the question.
The court will not reverse a judgment unless injustice may. have been done and we can find no injustice in keeping upon the record testimony which the now objecting party had so strenuously insisted should be received.
The objection taken to the testimony of Dr. Millard when re-called by the proponents, that the witness, being a medical attendant of Mr. Hoyt, could not testify to any-communication between James Hoyt and himself, cannot be *743 sustained, because the contestants themselves had opened the door wide to such testimony from this witness.
He had been cross-examined by the counsel for the contestants, and his testimony in relation to communications between Mr Hoyt and himself, and in respect to information procured from Mr. Hoyt, to enable him to act as his medical adviser, and such examination extends over hundreds of folios.
After the contestant has opened the door and got in from the witness all she desired upon these forbidden subjects,' she cannot complain if the door is kept open until the proponents complete their examination.
The objection does not seem to be well taken for another reason
It is to be observed that the prohibition of the Code, § 834, does not extend to all information acquired in attending á patient in a professional capacity, but such information must be acquired for the purpose of enabling him to act in that capacity. Renihan v. Dennin, 103 N. Y., 573.
It is evident that the evidence of Dr. Millard consisting of communications between Mr. Hoyt and himself, which was specifically objected to, was not acquired for the purpose of enabling him to act as Mr. Hoyt’s family physician, but that the whole of the conversation was directed by Mr.. Hoyt as to what should be done about his daughter and that the description of his feelings to the doctor was for the purpose of showing the necessity of doing something in respect to his daughter, and not to give the doctor information to enable him to prescribe for him. The onJy other objection to the admission of testimony given by Dr. Millard was that in respect to Mr Hoyt’s mental condition down to the fifth day of July, is disposed of by what has already been said The contestant and her counsel, after they had insisted upon the examination of the attending physician in respect to knowledge acquired as such and had examined these witnesses at great length upon these subjects, could not, by objection, stop the continuance of such examination simply because they found the evidence was not tending to their benefit.
The claim that the surrogate erred in permitting Drs. Millard and Talcott to testify regarding the physical and mental condition of Mary Irene Hoyt is not well founded. Drs. Millard and Talcott were not permitted to testify as to what they had ascertained to be the physical and mental condition of Miss Hoyt while attending her as her physicians. The surrogate was scrupulously careful to exclude all evidence of this character. The doctors, however, were allowed to narrate the conversation which they had had with Mr Hoyt in respect to Miss Hoyt; to tell what *744 they had told Mr. Hoyt upon this subject and these conversations were not received as any evidence of the truth of the statements contained in those conversations.
What the physicians told Mr. Hoyt was clearly competent. A large portion of the evidence in the case offered by the contestant was for the purpose of showing that Mr. Hoyt supposed his daughter to be insane and that he was under a delusion in supposing her to be so, and that to that extent at least his mind was impaired.
To sustain this allegation it is not sufficient to show that Mr. Hoyt’s belief in this respect was not well founded. Although it may be true that Miss Hoyt is not actually insane, the proponents had the right to show upon what-Mr. Hoyt founded his belief as to her sanity, and that it had for a cause something worse than a mere baseless delusion which tended to show a condition of lunacy at least-in respect to this subject.
Even if he was mistaken upon this question, this did not take away his testamentary, capacity, as the right of a. testator to dispose of his estate depends neither upon the-justice of his prejudices nor upon the soundness of his reasoning. Clapp v Fullerton, 34 N. Y., 190. He may do-what he will with his own; and if there be no defect of testamentary capacity, and no undue influence or fraud, the law gives effect to his will though its provisions seem to us to be unreasonable and unjust.
If unsound conclusions as to sanity or insanity necessarily show a disordered mind, it is feared that none of those professional men who have made a study of mental disturbances will ever be able to make any valid testamentary disposition of their property, as we think that it will be conceded that the most skillful have at times drawn incorrect conclusions.
The surrogate did not err in admitting the medical certificate of insanity certified to by Dr. Millard.
Mr. Hoyt’s treatment of his daughter, his belief as to-her mental condition, were the subject of lengthy inquiry. The fact of her incarceration in a lunatic asylum by him was also the subject of investigation by which it was sought to establish that he was acting under an insane delusion in respect to his daughter’s mental condition. Evidence of every kind relating to such daughter’s condition which came to Mr. Hoyt’s knowledge was clearly competent for the purpose of showing upon what testimony ho acted, that his belief was not without foundation or sup • port.
This certificate of insanity, certified to by a reputable-physician, might afford strong ground for the belief upon *745 which Mr. Hoyt acted in sending his daughter to the asylum.
The claim that because this certificate was made in 1880, and because these transactions then took place, and the wifi in question was made in 1882, they are not shown to have any connection with the making of the will is without foundation, as it was not only pertinent but proper to go to the very origin of whatever belief Mr. Hoyt had in respect to his daughter and to investigate all the evidence which was brought to his knowledge upon this subject.
The question as to the disposition of the papers produced by Mr. Conkling under a subpoena duces tecum, issued on the motion of the appellant, was correctly disposed of by the surrogate.
His duty evidently was to restore the papers to the custody from which they were removed by the process of the court, and if the contestant was entitled to them, she had her legal remedy, which was entirely open to her.
The surrogate was in no manner called upon to determine in this proceeding any question whatever as to the legal title to the papers in question.
As no question has been raised but that the will m question was duly executed in accordance with all the formalities prescribed by law, it only remains to consider whether there was sufficient proof to establish that at the time of its execution the decedent was of sound mind and memory, and that it expressed his free, untramelled testamentary purposes, using the language which the' surrogate defined the issues to be tried in the proceeding.
The contestant alleges that the testator at the time of the execution of the will was not of sound mind and memory, and that its execution" was obtained by fraud, circumvention and undue influence.
Within the limits to which this opinion must be confined, it will not be possible to discuss with any degree of minuteness the immense mass of evidence relating to these questions contained in the 13,000 folios presented as the record of this case, but we must content ourselves with a brief discussion of its most general features and of some of the claims of the respective parties in relation thereto.
Mr. Jesse Hoyt, the testator, was born in the city of New York in the year 1814, and consequently was about sixty-eight years old at the time of his death.
In 1837 he was married to Helen Maria, who survived him as his widow, and the only issue of such marriage was a daughter, Mary Irene Hoyt, born in December, 1838.
He started business as a clerk, soon became a partner *746 with the firm, which was very successful in its business operations.
Mr. Hoyt was a man of verjr active business habits, possessed great business qualifications, a determined will, was of very positive ideas and very strong in his likes and dislikes.
During his career he acquired a very large fortune, amounting to at least six millions of dollars.
About the middle of March, 1882, he was compelled by a complication of diseases to abandon active business, and from this time until he died on the 14th day of August, 1882, he seldom left his house, and from the • fifth day of June was confined to the limits of his bedchamber and a room adjacent.
The will in question was drawn by Mr. Cornelius Van Santvoord, who had been the counsel for Mr. Hoyt’s firm and the legal adviser of Mr. Hoyt in his individual matters for more than twenty-five years.
On Tuesday the 20fch day of June, 1882, the testator sent for Mr. Van Santvoord and he went to his house in West Forty-Eighth street, in this city, and had an interview which lasted about three hours.
Mr. Van Santvoord also saw Mr. Hoyt on Wednesday, on which two days he received most of the instructions as to the contents of the proposed will.
The testator told him he had sent for him to draw his will. Mr. Van Santvoord referred to the fact of his having drawn a will for him in 1858. Mr. Hoyt stated that he had drawn two wills since then by Mr. Bruorton (who had been for many years managing clerk in Mr. Van Santvoord’s office). Mr. Van Santvoord asked for these wills to use as a form and to make notes in pencil of any changes proposed; the testator replied that those wills were not at all what he wanted, and that they would be of no use; that he had some memoranda made by Mr. Jackson, who was then present (and who was the confidential clerk of Mr. Hoyt), and handed them to Mr. Van Santvoord.
Mr. Van Santvoord replied that he would prefer to collect his meaning as to what he wanted to do from his own statements direct, and not through memoranda which they might refer to by and by.
The testator then told him what provision he intended making for his wife, the provision he desired to make for his daughter, and in this connection he stated that it had been a very painful subject to know exactly what provision to make for her and how to make it.
He then gave directions as to the management of certain specific property, and referred to a number of pecuniary legacies which were not incorporated in the will because *747 disposed of afterwards in executed gifts, and gave directions as to the residuary clause and assigned reasons for excluding his daughter from it
He also gave directions as to specific legacies which were included in the will, assigning reasons for differences made in respect to certain legatees, which were exceedingly significant, giving legacies to his brothers and his brothers’ wives where they had children and confining his bounty to his brother alone where there had been no children of the mar - riage He also named the persons who were to be the executors of his will, recognized the necessities of administration in respect to his property in Michigan in the appointment of his old friend and adviser, Mr. Webber, and before giving final instructions as to the clauses appointing Webber as the executor, he expressed a desire that he should be sent for, and directed Mr. Jackson to telegraph Mr. Webber to come on, and pertinently criticized the message as suggested by Mr. Van Santvoord.
A draft of the proposed will was made on Thursday, June 22, except the clauses about which Mr. Hoyt desired to consult Mr. Webber, and was submitted to Mr. Hoyt on Friday and read over to him, except some clauses Mr. Hoyt wanted to see Webber about, and he made some suggestions in regard to it. Mr. Webber arrived in this city on Saturday morning, June 24, and arranged to meet Mr, Van Santvoord at Mr. Hoyt’s house that afternoon Mr. Van Santvoord having been prevented from keeping the appointment promptly when he got to Mr. Hoyt’s house found that Mr. Webber had left. He suggested that Mr, Webber and himself should call the next day, to which Mr Hoyt objected, as his wife did not like to have business transacted on Sunday. Mr Van Santvoord then went to Mr. Webber’s hotel, where he found him engaged in preparing the articles of the will which relate to property m Michigan according to instructions that he had received from Mr. Hoyt when he called upon him
While at the hotel a letter was received from the testator written the same day, Saturday, June 24, 1882, as follows:
“Dear Mr. Van Santvoord:—I feel like full completing, if possible, tóm ” (here follows something that is indeci pherable) “ to-morrow to a sig signature to a signature—so arrange *’ (then occurs a word or a combination of letters that is unintelligible). “Arrange for a meeting anywhere —Hotel perhaps—as Mr Webber may have to leave for home any moment, and I am desirous to have completed myself by myself Monday morning
Truly,
JESSE HOYT
*748 All the articles relating to matters referred to Mr. Webber by the testator were there completed by Mr. Webber and Mr. Van Santvoord
They went to Mr Hoyt’s house at three o’clock on Sunday afternoon, the 25th of June; having on Sunday morning received another letter from the testator in which there was no omission or repetition of words appointing that hour for a meeting.
The clauses prepared as above, and other clauses, were then read over to the testator, and discussions arose as to appropriation for a library at Saginaw, and after all the articles had been read over the testator said “that is what I want.” The engrossing of the will being completed on Sunday night or Monday morning, Mr. Webber and Mr. Van Santvoord went with the engrossed instrument to the testator’s house, and the whole of the will was carefully read over to him, after which he said, “ now I am ready to execute it. The will was then signed by the testator at the end of it opposite the seal, and he also signed each of the half-sheets, after which he declared it to be his last will and testament in the presence of the witnesses, and asked them to subscribe their names as witnesses to it, which they did in the presence of the testator, and in the presence of each other.
The evidence that Jesse Hoyt, at the time of the execution of this will,, was possessed of full testamentary ca • pacity, seems to be overwhelming
That his physical powers had been terribly wasted by disease was undoubtedly true, but the evidence seems to-show conclusively that his intellectual vigor and activity were not only not so far weakened as to destroy his testamentary capacity, but that there had been no perceptible change in his mental powers. In the case at bar by the instrumentality of the contestant we are afforded the very best evidence that could be produced upon this subject, and of which we are ordinarily deprived, viz.: the testimony of the physicians who attended Mr Hoyt in his last illness.
Drs . Camochan, Dillow and Millard all concur that there-were no indications of weakness, failure of memory, or perception, nor any deviation from the ordinary standard of intelligent capacity until long after the execution of the will The occurrences of the 23d and 24th of June also show that Mr Hoyt fully appreciated his position, and that he had his mind fixed upon the necessity of attending to the matter of his will, and that he did not not wish that this business should be interfered with.
At a consultation of Mr Hoyt’s physicians held on June 23d, it was decided that the exigences of his position required the performance on the day following of a very painful *749 operation, and of this Mr. Hoyt was notified. In the evening he sent for Dr. Dillow, and Mr. Hoyt told him that he wished more definite information than he had yet received as to the nature of the operation he was to undergo on the next day, and as to its probable effect.
He said that it was a day he had set for the doing of important business, and he was anxious that nothing should interfere with its transaction.
Dr. Dillow assured him that he would be subjected to no treatment from which he would not be likely to rally in a few hours.
On the 24th, Saturday, the operation was performed, which was of the most painful character, and necessarily produced a great shock to his nervous system. He was given forty or fifty drops of McMum’s elixir of opium, and it was while suffering under the shock of this operation and dose of opium above referred to, that the letter of June 24th to Mr. Van Santvoord was written. »This letter called incoherent, dreamy and urged as indicating weakness of mind seems to us, instead, to be evidence of the strongest determination that nothing should prevent the consummation of his purpose in executing his will, and it is a matter of surprise that he should within so short a time after to painful an operation have had sufficient energy to write any letter at all. He undoubtedly felt terribly weakened by the operation, he had doubts as to how long it would be before he would rally from its effects, his nerves were unstrung, yet he appreciated the liability of Mr. Webber being called away, and notwithstanding what must have been his great physical suffering, the matter of the necessity of the completion of his will was before him, and he urged it in the letter mentioned. Upon the next day he had recovered from the effects of the operation and medicine upon his nervous system, and seemed entirely capable of transacting business.
The evidence of every person who saw him at or about the time of the preparation and execution of his will tends to show that the testamentary capacity of Mr. Hoyt was at that time far above the minimum standard of the law.
Mr. Webber, who had been for years his professional adviser, and who knew him well and thoroughly, says that though feeble in body he observed no change in his mind or character when he saw him during the preparation and execution of his will.
Mr. Leonard Hazeltine, who had known him since 1853 and had been his partner in business, testified that in all the interviews he had with him his conversation was rational, his speech was deliberate, and his questions intelligent and bright.
*750 Mr. Joseph Hazeltine, who had known him intimately from 1860, saw him for the last time on business between July first and fourth, and testified that his intellect and memory seemed to him to be as clear and bright as ever; that he was weak physically, but mentally he was bright; that his intellect was as clear as he had ever known it, and that Mr. Hoyt told him that he had given orders to have a new mill put up and gave him his reasons for it and at the last interview he had with him he expected to get well.
Mr. Kirby, who had had intimate business relations with Mr. Hoyt since 1854 was, also, examined. His last inter • view with him was on the twenty-third of June, and he had been in consultation with him nearly every day for almost a month in relation to the erection of a new planing mill in Michigan. He testified that during all these interviews he did not discover any change in regard to his mind or character.
This mass of evidence as to Mr. Hoyt’s mental condition is sought to be overthrown by the testimony of two physicians, who never saw Mr. Hoyt and knew nothing personally as to his condition mental or physical
The value of their testimony depends entirely upon the correctness with which the true condition of Mr. Hoyt was brought before them by the hypothetical question which comprises eight or, nine pages of this record.
If there is any element m this question which is not borne out by the evidence necessarily the whole of the evidence fails to be of any value, because element are considered in forming the conclusion which do not exist.
One of the statements of parts of the question was this: “His memory was limited to his physical state.”
This statement necessarily assumed that the testauOr had no memory of or for anything else.
If this statement was to be the foundation of an opinion it was not necessary to obscure it amidst eight or nine pages of other matter, because it is a self-evident proposition and requires no expert to prove that if a testator has no memory except that in relation to his physical state, that he has not testamentary capacity.
This fact which is assumed does not seem to exist in the evidence.
It is true that to the question: “His memory was limited then, to the physical status,” Dr. Camochan replied, “yes,” but an examination of the evidence both preceding and following this question, shows that Dr. Camochan did not intend to and was not understood to testify strictly to all that might be claimed from that question and answer.
*751 The doctor had testified that there was no failure of memory and that he did not converse with him outside the sphere of his medical duties as an inquirer into his phyisical state, that the only tests of his memory which he used were by calling for his recollection of his former condition, the state he was in, and comparing the same with what he had stated on former visits, and then follows the question, which clearly implied to the doctor’s mind that the tests of his memory were limited to his physical condition.
His subsequent evidence shows conclusively that this was the understanding of counsel as to his evidence.
He is asked the question: “You tested his mind as to' perception, understanding and memory only by his detailing symptoms?” to which the doctor answered, “And whatever else came out in the ordinary conversation that his condition and his surroundings led to—his immediate surroundings.”
This false assumption in the hypothetical question entirely destroyed all weight which the answer to it would otherwise have had.
But there is another assumption contained in the supposed case upon which Dr. Hamilton formed his judgment, viz., that the patient was not only suffering from uraemia at the time of his death, but had been suffering from it a long time previous, which is entirely unsupported by the evidence as applicable to the case of Mr. Hoyt.
There is no proof that Mr. Hoyt had been suffering from uraemia a long time before his death, upon the contrary the evidence seems to be that there never was any symptom of uraemic poisoning.
Much stress was placed upon the letter of the 24th of June, by the experts who were examined on the part of the contestant, although they knew nothing of the circumstances under which it was written.
It is apparent that no judgment whatever could be formed of any value based upon an act, unless the circumstances under which it was performed are also given.
There are, in many other important particulars, discrepancies between the evidence of Mr. Hoyt’s condition and the case supposed in the hypothetical question put by contestant’s counsel.
But even if these errors in the supposed case did not exist, it would be extremely hazardous in the face of the testimony of every person who actually saw and conversed with the testator and observed his mental manifestations to make that of the witnesses who were called especially as experts, the foundation of a judgment that Jesse Hoyt had not testamentary capacity at the time of the execution of his will.
*752 The only remaining question to be considered is, was the execution of this will obtained by fraud, circumvention and undue influence?
The testimony in the case shows that Mr. Hoyt was a person of strong and determined will, set in his purposes, strong in his likings and dislikes; that he was not especially susceptible to control, that his will had not been impaired to any appreciable extent by the assaults of disease, that his instructions for his will emanated from his own mind and were the product of his own wishes, after as to some subjects for his own satisfaction he had sought the advice and suggestions of others to whom he would naturally have turned for advice.
In the arguments of counsel, as contained in the points submitted, assertions are made as to the conduct of Miss Hoyt towards her father, and as to the origin of her irritability and excitement, but we have been unable to find that the evidence in any' way justified such conclusions.
In fact it is admitted that from the year 1880, two years prior to the making of the will m question, her feelings of hostility to her father' became greatly aggravated because of the fact of her incarceration in a lunatic asylum by him, which incarceration she believed to be unjust and improper;
It appears that her father had long prior to this time entertained the opinion that she might be insane and that she became more and more troublesome and difficult to manage so that Mr. Hoyt could not leave home even for a brief absence, and that he desired and finally concluded that she should be placed in some .institution for the insane, in which conclusion her mother concurred.
Dr. Talcott, superintendent of the asylum at Middletown, examined her and pronounced her insane, in which opinion Dr. Millard agreed. Her father, however, hesitated, but in April, 1880, Mr. Hoyt, stating that his daughter was crazy and was killing him, reiterated the desire that she should be sent to the asylum, and she was accordingly sent to the Middletown asylum, Drs. Millard and Dillow having made the necessary certificates.
In July, 1880, Mr. Hoyt took his daughter home again against the advice of Dr. Talcott, the superintendent of the asylum although she had improved. There is no pretense that any of the relatives of Mr. Hoyt, who are claimed to be the instigators and promoters of the incarceration of 1882 hereafter mentioned had any hand in or knew of this proceeding. The evidence shows that Mr. Hoyt was of the opinion that because of her violence, irritability, nervous and excitable disposition, her mind was unbalanced and *753 that it was necessary to put her under some restraint, he being constantly in fear that something would happen.
This brief period of restraint does not seem to have had a very calming influence upon the temper of Miss Hoyt She felt that she had been unjustly treated by her father, that her prospects in life had been blighted and she harbored resentment against him.
In June, 1882, Mr. Hoyt sent for Dr. Millard at three o’clock in the mormng and told him that his daughter was worse than ever and that he regretted very much that he had consented to her release from the Middletown asylum, and that the most charitable explanation he could put upon her conduct was that she was drunk, but that he had not been able to find that she resorted to stimulants.
Mr. Hoyt said to the doctor that she was raising the devil; that he had sent for him hoping that he might have some influence and give her something to quiet her; that she had been very noisy and uproarious, crying and making a scene, threatening him with a suit for false imprisonment and tyrannical treatment, called him a damned liar; that he had used every effort to conciliate and get her to be quiet; that he had promised her everything, but that she would not be pacified; that he was sorry to disturb him at three o’clock in the mormng, but that he thought that he might help them a little in their distress.
It would be difficult to imagine a more striking picture of the utter inability which this old man felt to struggle longer against the violence and outrageous conduct of this kind and dutiful daughter, as she is described by her counsel.
From this time until February, 1882, this line of conduct continued, and she began consulting lawyers and medical men upon the theory that she had been wrongfully imprisoned Among others whom she consulted was Dr. Fordyce Barker.
Mr Hoyt requested Dr. Millard to see Dr. Barker and tell him what they were doing; that they were all desirous of doing everything for Mary’s good; that he felt most kindly and affectionately and tenderly towards his daughter, and that he wanted him to know that they were not trying to oppress her.
Dr Millard saw Dr. Barker; he told Mr. Hoyt that Dr. Barker had said to him that he recognized Miss Hoyt at once as an insane person, and that she bothered him very much, and that as these cases were out of his jurisdiction, he had given her a note to Dr. Choate, who made a specialty of nervous maladies
At Mr. Hoyt’s request, Dr. Millard saw Dr Choate, and *754 he told Mr. Hoyt that Dr Choate said that she was clearly insane.
(Neither Dr. Barker or Dr Choate were called to contradict this statement of Dr Millard.)
Mr Hoyt then said that some measures must be taken to get her away Dr Millard declined to sign any more certificates, because it made Miss Hoyt very hostile to him, and Mr Hoyt asked him to request Dr. Choate to see his daughter at his house, and also Dr. Seguin.
Dr. Millard told Mr. Hoyt that Dr. Choate, after several interviews with Miss Hoyt, expressed his belief to him that-she was insane^ but that he himself had not seen evidence-which would justify him in giving a certificate to that-effect, and that Dr. Seguin gave him an opinion of the-same purport.
After the 17th of March, 1882, the period at which Mr. Hoyt’s confinement to the house commenced, the conduct-of his daughter disturbed Mr. Hoyt so that he could not obtain sleep and he consulted Dr. Millard as to what should be done. He told him that in spite of all his entreaties she-would persist in coming to his room while he was sleeping and arouse him; that when he wished to rest in the day time and told her that he was suffering from acute physical pain she would insist upon giving way to tirades about his tyranny, and would reproach him for his want of kind • ness, his peevishness, his penuriousness, his injustice, and threaten him with law suits; that he had tried to pacify her by every possible means, but could not succeed, and that if his maladies did not kill him his daughter surely would. Mr. Hoyt further said that Mary was perpetually harping-upon the sum of $100,000, which she claimed, and which he said he was willing to give her at any time if that would satisfy her; that he would give her $300,000, but that he-knew that she was not competent to hold any money in her own right, and that he would have to put it into the-hands of trustees, which Mary was not willing to accede to.
Mr. Hoyt desired Dr. Millard to sign a certificate of insanity, which he refused, saying that he thought it best-not to sign such a certificate; that very likely if his daughter was incarcerated again, he would relent a second time,, and that the whole obloquy would be put on his shoulders.
Mr. Hoyt said Drs. Choate and Seguin do not wish to sign a certificate, can’t somebody else be got to examine Mary? I don’t want them to send her to an asylum if they are convinced that she is competent' to take care of herself; I don’t care what it costs; I don’t care what I pay these people; some one must help me; I am a defenseless man; I .am treated very cruelly, and something must be done.
One day she was in her father’s room, while Dr. Millard *755 was there, clamoring rather violently for $100,000, Mr. Hoyt said he wished she would stop her demand; he did not know what would satisfy her. The doctor said to him, ‘ < Why not give it to her and take her at her word. Suppose we call her in and offer it to her.” Mr. Hoyt said to her, “Mary, I will give you $300,000 if you will keep quiet. I don’t care how much the sum is if you will only let me be in peace.” Mary said, “Will you give it to me in my own hands?”
Mr. Hoyt said, “No, I will give it to you so that you shall enjoy the income of it, because you are not fit to be trusted with money; but $300,000 shall be placed to your credit, and you shall have the absolute use of the income of it;” and then Mr. Hoyt said to the doctor, “My daughter is not fit to be trusted with money to any extent.” This offer Mary would not accept.
Mr. Hoyt also spoke to Mr. Leonard Hazeltine about having been compelled to send his daughter to a lunatic asylum; that he had tried to keep the knowledge of it from his friends.
In June, 1882, Dr. Talcott was sent for, and while he was talking with her father she came suddenly in the room and said, ‘ ‘ By God, I am going to have no conversation in this room between you and Mr. Hoyt unless I hear it.”
Dr. Talcott replied that he had nothing to say that he was unwilling she should hear. Mr. Hoyt asked her to keep quiet, and she said, “God damn you, I will not keep quiet;” and then Dr. Talcott asked her what she wanted, and she said she wanted $100,000; and she said to her father, “If you don’t give it to me I will send for a lawyer and have you dragged through the streets of New York and have you locked up in the tombs.”
Mr. Hoyt turned to Dr. Talcott and said, “I will put $300,000 in the hands of any honest inan, so she may have the use of it as she needs it, but I do not dare to give her $100,000 in cash. I can’t do it.” Miss Hoyt then said, “I want $100,000 in cash now;” and turned to Mr. Hoyt and said, “I have already won my suit at law.” Dr. Talcott told her that she ought not to talk in that way to her father while he was sick, and she replied, “I would marry the vilest drunkard in New York, if by so doing I could be revenged against my father;” and after Dr. Talcott and Mr. Hoyt had kept perfectly quiet she, reiterating her statements, finally left the room, when Mr. Hoyt turned to Dr. Talcott and said, “That is the way she treats me almost every day, and almost every night brushes into the room, almost afi hours of the day and night, and I can’t sleep or rest.”
It is needless to cite any more instances of these kind and *756 delicate attentions with which Miss Hoyt continually surrounded her father.
It is evident that he was willing to do anything to make his daughter comfortable, although he knew she hated him, but he was not willing to give her any large sum of money outright, because he knew that she was utterly incapable of its management. The wonder seems to be that he should have made so liberal provision for her as he did in his will.
If he thought his daughter insane it certainly was not a belief that had no foundation, and, therefore, a delusion, but it was a belief in which he had very respectable company.
On June, 1882, certificates of insanity having been signed by Dr. Talcott and Dr. Dillow, and Mr. Hoyt and his wife having severally signed a request that their daughter be admitted into the asylum, and it appearing from her own testimony that Mrs. Hoyt signed this paper with full knowledge of its contents and the object it was designed to accomplish, and that the removal was in accordance with her wishes and judgment, Miss Hoyt was removed by force from her father’s house and sent to a lunatic asylum, Mr. Samuel Hoyt and Jesse Hoyt, Jr., accompanying her, Mr. Alfred Hoyt being in the house at the time. The only evidence in respect to the participation of the Hoyts in this matter were the calls of Mr. Alfred Hoyt on Dr. Millard and the fact that Mr. Samuel and Jesse Hoyt, Jr., accompanied Miss Hoyt to the asylum instead of allowing her to be taken alone by employees.
It appears that these calls of Mr. Alfred Hoyt upon Dr. Millard were induced by the apprehension as to the effect of Miss Hoyt’s conduct upon her sick father, and that he desired to act secretly or supposed that there was any necessity for secrecy, seems to be disproved by the fact that he thought that it might be best to invoke the aid of a sheriff’s jury, to which the decedent objected because weeks must elapse before it could be consummated, and he could not wait, for he was being gradually killed off.
These acts of the Hoyts do not in any manner support the claim that they were influenced by sinister motives in getting Miss Hoyt out of the way, but that the whole desire was to relieve the decedent from those terrible assaults which his daughter was continually making upon him, and it appears that they acted in furtherance of the testator’s wishes and in pursuance of his express directions.
It is urged by the counsel for the contestant that it is a very strong circumstance, showing the weakness of Mr. Hoyt’s mind, that at the time of the removal of his daughter to Pennsylvania he gave the name of his daughter, *757 whom he had described in his wills of 1870 and 1878 as Mary I. Hoyt, to Dr. Millard as Mary Jane Hoyt.
It is to be observed that Dr. Millard was by no means certain whether it was Mr. or Mrs. Hoyt who gave him the name; that it was one or the other, and, therefore, there is no proof as to this mistake that does not apply as strongly to Mrs. Hoyt as to Mr. Hoyt, and it is a mistake in the name which Dr. Millard may have very easily made.
The claim that any undue influence was practiced on the decedent by his brothers Alfred M. Hoyt and Samuel N. Hoyt seems entirely unsupported by the slightest evidence.
It is urged that because his brothers visited the decedent frequently, that his confidential clerk Jackson did the same thing, therefore, they being beneficiaries under the will, undue influence must have been exercised.
The result of this claim is that a man, because he is wealthy, cannot have the aid and comfort of those to whom he would most naturally look for kind offices during seasons of illness, and who would be the natural object of his remembrance in the disposition of his estate.
We are told by the counsel for the contestant that from the time the decedent was confined to the house in March, 1882, some of his relatives called upon him daily, seeing him in his room alone to the exclusion of his wife and daughter. *
It appears from the testimony of Mrs. Hoyt that there was no exclusion about it. That when Mr. Hoyt had company with him she did not remain in the room, but went out of her own accord.
His daughter hated him and he knew it; he believed, not without good foundation, that she was not to be trusted with large amounts of money, and that as she was nearly forty-four years old and unmarried that there was no probability of her having children.
He made for her a provision which would, in his judgment, far exceed anything which she could possibly employ in supplying her needs, luxuries or most extravagant fancies.
It is further urged in evidence of undue influence that there was evidence of memoranda in Mr. Alfred Hoyt’s handwriting having reference to provisions to be made in Mr. Hoyt’s will.
The origin of these papers is unexplained. Mr. Hoyt could not testify as to them, but from the fact of their existence we may reasonably infer that Mr. Alfred Hoyt participated to some extent in the preparation of this will, and it may well be assumed that the decedent consulted him in respect thereto, and could anything be more natural?
The decedent was a man of large wealth; Mr. Alfred *758 Hoyt was his brother, and had been his business partner; the decedent was confined to his room, is it an evidence of undue influence that he consulted this brother as to his will, or even that this brother made suggestions in respect thereto?
To whom could he apply? Mr. Jackson was his confidential clerk. He undoubtedly knew everything about his employer’s affairs, and the claim that his frequent visits support the theory that he was engaged in conspiracy against his employer seems to indicate how utterly without foundation, this whole structure of undue influence has been attempted to be reared.
The circumstance that Mrs. Hoyt was not consulted about her husband’s will adds nothing to the claim of undue influence.
That was a matter for the decedent to determine. If he .desired to consult her as to her will, there was ample opportunity for him to do so. There is no evidence that he was accustomed to consult her about his affairs, and we are led to the conclusion that he was not, from the fact of her voluntarily leaving his room whenever she thought that business affairs were to be talked about.
We have not thought it necessary to compare the provisions of the will in question with those formerly made by Mr. Hoyt, for the purpose of showing how great or how little was the departure in the will in question from the testamentary disposition as expressed in previous wills, because even if there had been a complete departure in the will in question from the provision^ of a will made fourteen years before, in view of the overwhelming evidence of Mr. Hoyt’s testamentary capacity such departure would form no ground for the setting aside the expressed will of the testator as contained in the instrument under consideration.
The rectitude of Mr. Van Santvoord’s conduct in this matter seems to be established beyond question by the fact that he produced the letter of June twenty-four, which forms the strongest, if not the only evidence that Mr. Hoyt had not testamentary capacity at the time of the execution of his will of the twenty-sixth, and that he produced the memoranda in Mr. Alfred Hoyt’s handwriting, which was the only proof that he (Alfred Hoyt) had ever spoken to the decedent upon the subject of this will. Mr. Van Santvoord knew the value of this evidence to the contestant, and if he had-been engaged in a conspiracy to defraud, there would have been no difficulty in his suppression of it.
It is not necessary for us to determine here whether Mr. Hoyt’s belief in the condition of his daughter was well *759 founded or not. If he did believe her insane and not fit to take care of herself, his belief was shared, as has already been said, by many others; and even Dr. Seguin, who was called as a witness on behalf of the contestant, was of the opinion that Miss Hoyt was of an ugly disposition and eccentric, but not legally insane; that her extreme peculiarities must make life with her very hard, but that he was under the impression that these peculiarities were largely the result of unfavorable domestic surroundings and injudicious parental care; that she had a nemopathic temperament, which approaches closely to an insane temperament in medical nomenclature, and that she had been in that condition many years; that of two medical experts examining her as he did, one might well and honestly declare her to have passed beyond the point of the rational state and the other think that she had not.
If this was Dr. Seguin’s opinion, who was the most favorable witness that the contestant seems to have been able to produce, is it any evidence of delusion on the part of Mr. Hoyt, who had so much better opportunity to judge of her conduct, to have believed her insane.
But these questions cannot be discussed at any greater length, although much more might be added, as this opinion has become much more voluminous than was intended. The conclusion necessarily forced upon us by an examination of this record is, that at the time of the execution of this will Mr. Hoyt was of sound mind and memory, and that such will expressed his free, untrammelled testamentary purpose.
The decree of the surrogate should therefore be affirmed, with costs.
Daniels, J., concurs.